JOSÉ HERNÁNDEZ NIEVES, Appellant, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Defendant.

No. CI-63-22. Decided May 8, 1964.

Nachman & Feldstein and Ernesto Maldonado Pérez for appellant. Donald R. Dexter, Ángel de Jesús Matos, and Aura N. Pérez for the Manager of the State Insurance Fund.

Division composed of Mr. Justice Blanco Lugo, as Chief Judge of Division, pro tempore, Mr. Justice Dávila, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

For about 16 years José Hernández Nieves, appellant herein, worked as overseer in a tobacco field in the town of

Comerío. One of his duties was to build bonfires inside the sheds to dry or extract the humidity from the tobacco, "to scorch it," as was said in the course of the hearing. This operation which was carried out for two months every year —generally in January and February, the cooler months— exposed him to the inhalation of smoke and perception of the odor characteristic of the tobacco leaf. With the passing of time appellant experienced shortness of breath and a dry persistent cough which was aggravated when he went inside the sheds to perform that task. He was compelled to go outside to get some fresh air to alleviate the irritation caused by the inhalation of smoke and the perception of the odor. In 1960 he went to the health center of Comerío for the purpose of receiving treatment to alleviate his condition. He was referred to the district hospital and to other specialized centers. His ailment was finally diagnosed as pulmonary fibrosis.

On October 30, 1961 an employer's report was rendered to the State Insurance Fund setting forth that "about two years ago, while working in the tobacco sheds, he began to cough and could not breathe well." In November he was referred to Dr. Héctor Martínez Villafañe who performed several examinations in Clínica Antillas, where he was confined for about 15 days. On January 3, 1962 Dr. Jacobo Simonet, Chief of the Division of Chest Diseases of the State Insurance Fund, rendered a special medical report which in its pertinent part, after describing the findings of a tomogram, reads: "The findings toward the right upper lobule and the left vertex [of the lungs] are probably due to a chronic infection of tuberculous origin accompanied by secondary bronchiectasis. The lobulated dense shadow toward the right hilus is very probably of neoplastic origin." He therefore concluded that the pulmonary lesions did not bear any relation to his work nor had been aggravated as a consequence thereof. The Manager ruled that there was no history of the occur-

rence of a labor *accident*, and that if any had occurred appellant's condition had no relation with his work.

Hernández appealed to the Industrial Commission by means of a memorandum alleging that his condition was the result of a labor *accident* and that there was causal relation with the *accident* sustained. On June 19, 1962 a medical hearing was held before the Industrial Commission. On that same date Dr. H. Vázquez Milán, medical director of that agency, rendered a report in which, after making reference to the findings of the studies made by Dr. Martínez Villafañe, he said that "in view of the history which the workman has just given us, we have the impression that his condition is directly connected with his work," and in view of Dr. Abel de Juan's disagreement with this conclusion he referred the matter for discussion at a public hearing.

The Industrial Commission held a public hearing and issued an order which in its pertinent part reads:

"At the opening of the hearing Dr. Vázquez Milán stated that he had intervened in this case at a medical hearing held June 19, 1962; that there was a number of reports, among them one from Dr. Jacobo Simonet, who was of the opinion that as a result of the laborer's chronic infection of tuberculous origin accompanied by secondary bronchiectasis his condition had no relation to his work; that there are other reports of pulmonary function made by Dr. Héctor Martínez Villafañe showing that the laborer's condition is pulmonary deficiency due to a chronic infection of a high respiratory type; *that his condition of tuberculous activity or nonactivity not having been determined, it would be advisable to have him examined by the phthisiologist of the Commission, Dr. David García,* and to send him the radiographic and tomographic studies made on the laborer, in addition to the laboratory information on pulmonary functions made by Dr. Martínez Villafañe."

On October 31 Dr. García rendered a report ruling out any lesion of tuberculous origin, "since the result of Koch's bacillus and also of four PPD tuberculin tests, intermediate doses, had been negative." In view of the presence of pulmo-

nary fibrosis accompanied by perihilar infiltration, he suggested a diagnosis of sarcoidosis—which would have no causal relation with the work—subject to confirmation by the "Kviem Nieven" test. This test was made in San Patricio Hospital with negative results, according to the corresponding report dated January 15, 1963.

It may be asserted that the public hearing held September 17, 1963 was devoted to receiving expert testimony of the different physicians who have intervened during the entire process of appellant's illness. Already in the course of this opinion we have referred to the examinations performed on him. We shall merely consider at this time other salient points of their testimony, with special emphasis on the causal relation of the disease and the work. *Dr. Héctor Martínez Villafañe* testified that Hernández was referred to him in November 1961 for the purpose of making a bronchography, which he was unable to perform because he presented marked pulmonary insufficiency; that afterwards he made some examinations in order to determine the capacity of the respiratory function, the finding of which was marked pulmonary emphysema due to fibrosis of both lobules in the upper region; that Hernández had pulmonary fibrosis "which he has acquired somehow, the bronchitis or some other prior condition which was aggravated during the period he inhaled smoke, which in my opinion must have affected him"; that tobacco powder contains silica and may produce fibrosis. When he was asked whether the laborer's condition could have been caused or aggravated by the working conditions, he answered: "Yes sir, I believe so, because[1] I cannot prove that that is the direct cause. But since the pulmonary insufficiency developed after working 16 years, I think that that is an important factor." The lung specialist, *Dr. Jacobo Simonet*, asserted that he examined the laborer

---

[1] It is probable that an error was committed in transcribing the stenographic sign. The adversative conjunction "but" makes more sense.

in October 1961 and found fibrotic lesions toward the right upper lobule and left vertex; that in his opinion Dr. Martínez Villafañe "suggests a new occupational disease called tobaccosis"; that the hazard to which claimant was exposed was not sufficient to produce pulmonary fibrosis, "because those places are not tightly closed, those sheds are quite high"; that there is no possibility for the existence of relation between the disease and the work, *"if there were an occupational disease of that kind, it is not listed in the tables"*; that he rules out the work performed by the laborer as a causative factor of the disease and attributes the same to infections of the respiratory system with which he has been afflicted, although "we do not know which were those infections." *Dr. David E. García* examined Hernández in October 1962. He ruled out several possible causes of his condition—tuberculosis, sarcoidosis, silicosis, syphilis and neoplasia—and intimated that the fibrosis was due to recurrent bronchial irritation. He said specifically that the working conditions could expose him to chronic colds and chronic bronchitis, and concluded that "I would not venture to say that that was the only thing which produced it, but I cannot rule it out either as an important factor." The medical adviser of the Industrial Commission, *Dr. H. Vázquez Milán*, after weighing the significance of ruling out other possible causes suggested for the changes in the pulmonary tissues, says emphatically that "So, if we rule out all other pathological conditions, if that is what remains to be done, we cannot but think that the environmental factor has exercised a potential suggested by the condition of pulmonary insufficiency of the existence of a causal relation."

In an elaborate decision the Industrial Commission determined that the medical evidence was clear and convincing as to the fact that the laborer was suffering from pulmonary fibrosis of unknown etiology. In the same breath it added: "Claimant's attorney alleges that his client is suffering from

an occupational disease, but from which disease? 'Pulmonary fibrosis' is not listed as such in the table of occupational diseases. What caused the pulmonary fibrosis to this claimant? We do not know for sure, since no diagnosis has ever been made in this case on the 'cause' of this pulmonary fibrosis." It elaborated on other considerations on: (a) the laborer's duty to establish the occurrence of "some act, of some unexpected occurrence, that is, that he sustained some accidental injury traceable to a definite time, place and cause"; (b) that the burden of proof is on the interested party to establish the "causal relation between the alleged disease and a labor accident," without relying on mere conjectures or intimations not supported by the evidence. Lastly, it alleges that the medical evidence is insufficient to hold that Hernández Nieves is suffering from an occupational disease, especially in view of the testimonies of Drs. García and Simonet who maintain "without a shade of doubt" that his pulmonary disease bears no relation to his work. It therefore held that claimant failed to establish that he is suffering from an occupational disease and dismissed the petition for appeal, thereby affirming the Manager's decision.

Reconsideration having been sought, the Commission ratified its decision of the case. As basis therefor it insisted, citing *Vélez* v. *Industrial Commission*, 79 P.R.R. 266 (1956), that in order to classify a disease as resulting from an *accident* it is not enough that it occur in the course and as a result of work. It alleged further that the case of *Atiles* v. *Industrial Commission*, 69 P.R.R. 586 (1949), was the most similar to that at bar, but it pointed out that the doctrine therein established had been set aside by virtue of the following language in the matter of *Salazar, infra*: "In those opinions this Court relied on cases and used language which was so broad that the rule seemed to be 'that all diseases traceable to the work of the employer are compensable on the theory of "an accident," despite the fact that they are not

included in the list of occupational diseases established by the Legislature.' [Citation.] We now reject this thesis." Lastly, it pointed out that since pulmonary affections are covered by § 3(a) of the Act as diseases occurring in the course of work and as a result thereof, it was evident that even though claimant's fibrosis was related to his employment, the requirements established in that provision were not met either.

In order to fix the issue within its real perspective it is necessary to sum up the different grounds adduced by defendant agency for dismissing the claim: (1) that the accident is not compensable;[2] hence, its reference to claimant's duty to establish the occurrence of some act, of some unexpected event and of an injury traceable to a definite time, place and cause; (2) that the disease is not a compensable occupational disease because (a) fibrosis is not listed in the table of occupational diseases of § 3 of the Act; and (b) considering the same as a pulmonary lesion, the requirements established in § 3(a) of the Act are not met; (3) the expert evidence is insufficient to establish that it is an occupational disease, on the basis of (a) the testimonies of Drs. Simonet and García which establish "without a shade of doubt" the nonrelation between the ailment and the work performed; and (b) the absence of a definite diagnosis on the origin or cause of the fibrosis.

 1. We agree forthwith that this is not a labor accident case. The two tests referred to in *Salazar* are lacking: (a) the injury must have been caused by an unlooked for mishap or an untoward event which was not expected or designed, and (b) the origin of the injury must be traceable within reasonable limits to a definite time, place and occasion. Larson, *op. cit.* at 514 and 515, n. 7 of the opinion delivered in that case. Theoretically an accident and a disease are distinct

---

[2] The decision of the Manager was based solely on the fact that it was not a labor *accident*. Apparently he did not consider the possibility of compensating the case as one of occupational disease.

and separate means of acquiring a disability. The characteristic of the former is that it may be fixed within the categories of time and space, it is sudden and unexpected; the disease develops gradually over an extended period. The evidence did not establish the occurrence of an accident. Although appellant's memorandum before the Industrial Commission on appeal from the adverse decision of the Manager refers to *accident* and to the existence of causal relation between the accident and the work, his legal representative admitted at the hearing that it could not prevail for that reason.

2. (a) This leads us to discuss the crux of the question involved in this appeal. In view of the present state of legislation in Puerto Rico, could it be asserted that for an occupational disease to be compensable it is absolute necessary that it be listed in the table of § 3 of the Act? But first it is well to point out a datum which helps to understand more clearly this entire situation derived from an ancestry without ramifications inherent in our medium. In a note in 47 Iowa L. Rev. 809, 810 (1962) on the expansion of occupational diseases by the courts, it is said: "Despite the identity of end results [it refers to disability], occupational disease coverage has lagged behind accident coverage in the United States. Initially at least, the primary cause for this lag was probably simple inertia since at common law occupational diseases were considered a risk assumed by an employee. On the other hand, recovery for accidental injury, although encumbered by the fellow servant, assumption of risk, and contributory negligence defenses, was a firmly entrenched cause of action available to an employee at common law." See, also, on the infiltration of common-law principles in this field, Horovitz, *Compensación por Accidentes del Trabajo: Cincuenta Años de Desarrollo Judicial*, 24 *Rev. C. Abo. de P.R.* 5 (1963).

Let us therefore review the legislative history of occupa-

tional diseases in Puerto Rico and the interpretative decisions thereof.

The remedial legislation awarding compensation to laborers was initiated with the enactment of Act No. 19 of April 13, 1916 (Sess. Laws, p. 50), which expressly limited its benefits "to all personal injuries by accident to employees, arising out of the employment, and during the course thereof" (§ 3). This Act was superseded by Act No. 10 of February 25, 1918 (Sess. Laws, p. 54), which retained substantially the accident requirement as the only test for the purpose of awarding compensation.[3] It was not until the enactment of Act No. 61 of July 14, 1921 (Sess. Laws, p. 472), which amended § 2 copied in n. 3, that the Legislative Assembly for the first time established compensability, in addition to the case of accident, of diseases occurring because of any act or function inherent in their work or employment and while engaged therein and as a consequence thereof, adding in passing as third requirement that the accident or the disease be a consequence of the work or employment.[4]

In 1925, by Act No. 102 of September 1 (Sess. Laws, p. 904), the broad criterion of occupational disease introduced by the Act of 1921 was qualified limiting the compensation to diseases or death due to the occupation *"as hereinafter specified"* (§ 2). To that effect a paragraph was added to § 3 (Laws, p. 914) providing that "The following diseases shall be considered as occupational diseases when contracted by a laborer or employee in the course of his employment, at any time within the twelve months prior to the date of his disability and when due to the nature of any process described below," followed by a list of the names of 15 diseases and the

---

[3] "Section 2.—That the provisions of this Act shall apply to laborers injured, disabled or killed by accidents occurring while engaged in their work."

[4] Section 3 was accordingly amended to define the rights in cases of diseases originating from the employment (Laws, p. 478).

description of the process.[5] Act No. 85 of May 14, 1928 (Sess. Laws, p. 630) retains this wording and for the first time it refers as title of the paragraph to the "Table of Occupational Diseases and Their Causes."

The wording of the present Act, No. 45 of April 18, 1935 (Sess. Laws, p. 250), is also identical. *Cardona* v. *Industrial Commission*, 53 P.R.R. 259 (1938), is the first expression of this Court on occupational diseases after the enactment of the Act of 1935. There we held that tuberculosis contracted while employed as a janitor in a public school, caused by the inhalation of dust during a period of employment extending over several years, was not compensable, since it was not listed in the table of occupational diseases. We considered the matter as "a case of *lex scripta*."[6]

Act No. 162 of May 14, 1943 (Sess. Laws, p. 524) merely added another disease—brass or zinc poisoning—in the table of occupational diseases. Act No. 115 of July 1, 1953 (Sess. Laws, p. 410) added four diseases, and further, in the first expression of the purpose to mitigate the inflexibility of the rule which excluded those diseases not expressly listed in the said table, the Manager of the Fund was authorized to add all those diseases which, after previous investigation, he may determine should be considered compensable occupational

---

[5] If we examine the table of diseases incorporated in the Act, it will be observed that it included some which were not justified considering the limited industrial development at that time.

[6] Act No. 45 of April 23, 1946 (Sess. Laws, p. 250), 11 L.P.R.A. § 4, added § 3(a) to the Workmen's Accident Act in order to compensate diseases of tuberculous origin contracted in the course of work and as a consequence thereof by persons exposed to contact in the course of their daily work in hospitals, dispensaries, offices or health centers and in laboratories in which infective tuberculosis material is handled and examined.

*Arroyo* v. *Plaza Provision Co.*, 68 P.R.R. 889 (1948), impliedly ratifies the holding in *Cardona* v. *Industrial Commission*, *supra*. On the other occasion in which we have considered a case of pulmonary tuberculosis, *Acting Mgr. State Ins. Fund* v. *Industrial Commission*, 73 P.R.R. 175 (1952), the ruling was based on the existence of an accident—lesion in the thorax—which aggravated the laborer's idiopathic condition.

diseases.[7] It is significant from the legislative intent that the original version of S.B. 269, which became Act No. 115, authorized and empowered the Manager to determine, in the case of diseases not expressly listed, whether or not they were occupational, and granted to the claimant an opportunity to review before the Industrial Commission any adverse determination. IV-II Journal of Proceedings 2455.

In February 1954 we held, by a divided opinion, that a doctor who dies of cancer produced by X-ray emanations to which he had been daily and continuously exposed over a period of 26 years taking X-ray pictures and fluoroscopies of his patients in the course of his employment was not entitled to compensation, unless compensation may be predicated on a finding that an injury by accident had occurred, in view of the fact that cancer was not listed in the table of occupational diseases of § 3. We cited with approval 1 Larson, Workmen's Compensation Law 604, to the effect that "The schedule list is exclusive, and it is not within the power of the courts to add new items, however obvious an occupational disease the omitted item may be." In view of the unfortunate conclusion necessarily reached in that case, we said that "Until our Legislature eliminates the requirement of an accident *or expands the table of occupational diseases,* cases like the present case will continue to remain uncompensated." (Italics ours.) *Salazar* v. *Indus. Comm.; Mgr. State Fund, Int.,* 76 P.R.R. 102, 113 (1954).[8]

---

[7] Upon questioning by the Court at the hearing of this petition, the legal adviser for the Manager asserted that that officer has never made use of this power.

[8] In order to mitigate the inflexibility of this exclusion rule, some American courts expanded by construction the list of occupational diseases and awarded compensation in cases of diseases "closely related" to those listed. *American Bridge Division, U.S. Steel Corp.* v. *McClung,* 333 S.W.2d 557 (Tenn. 1960); *Whitehead* v. *Holston Defense Corporation,* 326 S.W.2d 482 (Tenn. 1959). The reason adduced was the fallibility of medical science and the existence of a host of innominate diseases.

. In April of the following year, in the course of the debate on S.J.R. 1164 ordering the Manager of the Fund to make a study of the table of compensation of § 3, Representative Arjona Siaca, subscribing the recommendation made in the opinion in *Salazar*, suggested that such study should comprise the *expansion* of the term occupational diseases.[9] An identical resolution—H.R. 2741—except as to the source of the funds to pay for such study, was approved and became J.R. 11 of September 2, 1955 (p. 19).

*Vélez* v. *Industrial Commission*, 79 P.R.R. 266, decided April 30, 1956, ratified once more that for a disease to be compensable it must be expressly listed in the table of occupational diseases. We held that the relatives of a laborer who was engaged in cleaning the irrigation canals of sugarcane plantations and spraying DDT, and died from infectious jaundice produced by the parasites which transmit that disease, had no right to compensation, even if the infection was a normal and inherent hazard of his work and the disease was a typical occupational disease of those engaged in such work, since that disease had been excluded from the table. *Cf. Heirs of Fernández* v. *Industrial Commission*, 87 P.R.R. 837 (1963).

The fruit of the study ordered by J.R. 11 was translated into H.B. 242 which became Act No. 94 of June 22, 1957 (Sess. Laws, p. 439),[10] which expressly included 19 additional occupational diseases in consonance with the marked

---

[9] "What I wanted was . . . to ask whether there was considered the possibility, or rather the advisability, that the Manager of the Insurance Fund may also include in that report another matter as important as the one which has been pointed out by the Supreme Court in some cases, and that the extent of the term 'occupational diseases' actually calls for imperative legislative intervention." VI-III Journal of Proceedings 1473.

In view of the possibility that the Manager of the Fund may exercise a restrictive criterion, the study was subsequently entrusted to the Secretary of Labor. Journal of Proceedings *supra* at 1474–75.

[10] Report of the House Labor Committee, IX-III Journal of Proceedings 1445.

industrial development during the past decades—Nos. 21 to 39 of the table of § 3—and contained a general provision at the end of the table which reads as follows:

"In addition to the occupational diseases included in the preceding table, all diseases acquired in the course of work as a consequence of a risk peculiar to the particular industry, process, occupation or employment, and as a result of direct exposure of the workman or employee to the said risk in the normal performing of his work . . . ."

The only limitation imposed by the lawmaker on the determination of the existence of an occupational disease as a consequence of the risk peculiar to the work were: (1) that the last exposure to the risk of contracting the disease was within 12 months prior to the date on which the first manifestations of the disability caused thereby were observed, although there was recognized an exception in the case of diseases caused by compressed air or by retarded pathological changes of a malignant character in the bones, blood or lungs, caused by occupational exposure to or contact with arsenic, benzol, beryllium, cadmium, chromium, lead, fluorine, or exposure to X-rays, radium, or radioactive substances; and (2) that contagious-type epizootic, endemic, and epidemic diseases shall not be considered as occupational, except when contracted by laboratory personnel exposed to the risk thereof in the course of work by reason of handling or examining infectious material.

Lastly, Act No. 101 of June 24, 1960 (Sess. Laws, p. 277) included three new diseases in the table of occupational diseases:[11] No. 40, mogigraphia or clerk's cramp; No. 41, bagassosis—occupational disease acquired when working with sugarcane bagasse; and No. 42, which without identify-

---

[11] This Act introduced other changes as respects diseases caused by compressed air or pathological changes in the bones, blood or lungs. It is to these changes to which reference is made in the phrase "without prejudice to the provisions herein established," contained in the first paragraph appearing at the end of the table of occupational diseases.

ing it was described as to the process as any occupational disease acquired when working in the baking of bread and its by-products.[12]

■■ From all of the foregoing the inescapable conclusion is that as of 1957 the rule that for an occupational disease to be compensable it should be expressly listed in the table of § 3 does not bar a similar consideration of those contracted in the course of work as a risk peculiar to the occupation or employment. This is what the legislative history suggests. In 1955 the expansion of the table was authorized by administrative action and without the need of intervention by the legislative branch. And in 1957 there was added the provision which we have copied hereinabove the effect of which is to permit that *in a specific case* a laborer or employee may establish that his ailment or disease originated in a risk peculiar to his work, irrespective of whether such ailment or disease is listed in the table. It is well to clarify that this does not mean at all that after the causal relation of the disease is verified and established, it is considered automatically included in the table. That power is exclusively for the Legislature or the Manager, with the approval of the Secretary of Labor, pursuant to the delegation made to him in the last paragraph of § 3. The determination in a specific case shall benefit only the laborer or employee making claim.

■■ In accordance with the foregoing, claimant must establish that his condition was contracted as a result of a risk peculiar to the occupation or employment. Peculiar risk does not have a talismanic connotation. It refers as a whole to the existence of a continued risk, inherent in and peculiar to the activity within which the laborer must perform his work. It is not a risk to which the worker would be equally

---

[12] When the inclusion of this "disease" in the table was proposed, Senator Carrasquillo invited the attention of the sponsor to the fact that it was included in the general provision incorporated by the Act of 1957 which has been copied in the opinion. XIII-4 Journal of Proceedings 1866.

exposed outside of his employment; it is not a risk common to the vicinity. Simply, by reason of the employment the laborer must have been submitted to an unusual exposure. Nor is it necessary either to establish that the risk has equally affected other workers of the industry or employment. Only that the exposure to which the worker has been submitted is peculiar to the industry. Generally this may be deduced from the fact that the laborer's malady is not traceable to any other cause peculiar to the environmental character. In a great measure it may be a risk in the working conditions which the employer may prevent by adopting and providing greater and better safety measures.

■ (b) There is no basis in law either for the ground adduced by the Commission that, in the case of pulmonary affection occurring in the course of employment, the situation is covered by § 3(a), 11 L.P.R.A. § 4, and that the fibrosis from which Hernández is suffering does not meet the minimum requirements to come within the field of compensability. A mere reading of this provision shows that although it refers to diseases of the respiratory system—as would be pulmonary fibrosis—by its own terms it is limited to those "of tuberculous origin." If anything was clearly established by the evidence, it is that Hernández' ailment is not of tuberculous origin.

■ 3. There remains to examine the reasons relative to the result of the expert evidence. It is not correct to assert that Dr. García concluded "without a shade of doubt" that there is no causation between the disease and the work. An examination of his testimony as a whole leads to a contrary result. "I would not venture to say that that was the only thing which produced it, but I cannot rule it out either as an important factor," is the cautious assertion of a responsible professional who is conscious of the limitations which science itself imposes on him in attempting to determine a relation of cause and effect. Properly analyzed, it simply means that

the environmental working conditions is one of the causative factors of the ailment, although perhaps it may not be the only one. It should also be observed that the conclusion was made after ruling out the other suggested causes of the disease.

Dr. Simonet was of the opinion that there was no causal relation. At first he had attributed Hernández' condition to a chronic infection of tuberculous origin. He also said that the lobulated dense shadow toward the right hilus was probably of neoplastic origin. These conclusions were ruled out by subsequent examinations. However, if we examine his testimony it will be observed that his conclusion was prompted by the fact that fibrosis was not listed in the table of occupational diseases, a criterion which we have expressly ruled out. That is why he makes reference to the new disease of tobaccosis. He also relied on the fact that the risk to which claimant was exposed was not sufficient to produce pulmonary fibrosis, "since those places are not tightly closed." Irrespective of the fact that there was no evidence in that sense, nor to the contrary either, actually it cannot be gainsaid that Hernández performed work which exposed him to the inhalation of smoke and perception of the irritating odor of tobacco. The amount or degree of ventilation in the sheds cannot defeat or obliterate this fact.

The whole of the testimonies of the experts points preponderantly to the existence of a causal relation. The expert himself of the State Fund originally attributed claimant's condition to a possible tuberculous origin. When the examination to which he was submitted ruled out this possibility, other possible causes were suggested—neoplasia, sarcoidosis, silicosis—all of which were finally ruled out. Only the environmental conditions remained in the set of facts as the causative factor. It is so expressly claimed by Drs. García and Vázquez Milán. It so appears from the evidence.

Nor is it difficult to determine either that under the circumstances described the risk to which the laborer was exposed was peculiar to his work or employment, according to the connotation which we have already attributed to this term.[13]

We concede that the rule herein announced opens the doors to a new field of compensation and that this greater risk may mean the assessment of greater premiums. Irrespective of whether, as already suggested, the risk may be minimized by providing more and better safety conditions in the employment or work, we cannot overlook the preponderance of the social value which the economic rehabilitation of the labor force represents in the Puerto Rican community.

The decision of the Industrial Commission of October 2, 1963 will be set aside and the case remanded for compensation as provided by law.

---

[13] In his decision disallowing the claim the Manager adduced as additional ground the delay in making claim. However, at the opening of the hearing he expressly desisted from insisting on this question. We need not therefore consider it. *Cf. Guzmán* v. *Industrial Commission*, 85 P.R.R. 674 (1962).